I have full counsel in this case, Norman James, and we are going to split the argument in as much as we split the claims in the court below. I'm going to handle the Strickland claims, 5 and 12, and Mr. James... We'll do it with the U.S. Attorney's Office. I sure wish. And I'm going to... When I'm talking about the past, I'm talking about 35 years ago, not last week. Mr. James will handle the misconduct and the misconduct claim. And let me begin by stating that we understand we have a heavy lift. We understand that the California Supreme Court decision denying the claims on the merits is entitled to deference. We understand the bar in 2254D. We understand we have to show an unreasonable application in my claims of Strickland. Under the doubly deferential standard. And we have to show an unreasonable determination of the facts in light of the evidence presented to the California Supreme Court under D2. Now, understanding all those hurdles we have to go through, essentially we fall back on our facts. Because we think if you take a good hard look at this case and the evidence that was presented to the California Supreme Court by State Habeas Council, you can't come to a conclusion that this verdict is reliable or that you can have any confidence that a fair trial took place in this case. Let me start with claim 5. This is a one witness case. A fellow by the name of Juan Cebreros testified that he was in a parking lot with a friend at 2 o'clock in the morning when the petitioner came, pulled out a gun, put it in the face of his friend and said give me your money. Then shot that individual. And Mr. Cebreros then turned around and ran away. His testimony was he got 10 to 15 meters away and then he was shot in the rear of the leg. Now, that's the version that the jury heard. There was no other corroborating evidence. There was no other eyewitnesses. There was no forensic evidence. There was Mr. Cebreros. Well, we do have other witnesses who put your client at or about the time of the crime in and around that bar, do we not? There's no question that our client was in the bar. At the time the robbery occurred? The bar was closed. The bar was closed. Okay, but your client, if I understood the testimony of the bartender at Ricky's down the street, she testified that at the time she was closing Ricky's, your client was using the restroom and she had to pound on the door and tell him it's time to go. So we know that he was in the vicinity and then other people at the bar had seen him at the pair of Aces earlier in the evening. That's correct. Okay. But no crime is alleged to have committed in those places. The crime is in the parking lot. Right. And that's one witness. Now, at trial, Mr. Cebreros testified and defense counsel cross-examined Mr. Cebreros on two main points, whether or not there had in fact been a robbery and what had exactly happened in the parking lot with respect to being shot. What was not brought out at trial was evidence that was available to trial counsel, which would have impeached Mr. Cebreros. Are you referring to the testimony of paramedic English and Officer Thomas? That testimony was at trial and they did cross-examine him. And their testimony was, in their opinion, when they first came to the crime scene, they thought that Mr. Cebreros had a front entry wound to his leg. Right. On cross-examination, they brought out that this information was contained in two reports. However, the prosecutor had both individuals essentially fall back from their reports and say it was possible that they were mistaken. Now, that's done in the context, and it doesn't really pertain necessarily to the Strickland claim, but that's done in the context of the fact that she knew there was a medical report with two doctors saying the same thing as these two lay witnesses, that in fact he had been shot in the front of the leg. What was a through-and-through wound, right? And a jury heard testimony not only from English and Thomas, but also from Deputy Hawkins, the firearms expert, who basically said, you know, unless you can see stippling or gunpowder residue on clothes, it's hard to tell. So I guess the issue was in front of the jury. I think your argument is if they'd heard more evidence on this issue from the nurse and the doctor at Huntington Memorial, I mean, the district court thought that was cumulative, so how would that have changed the result? Well, I don't think it's cumulative at all if you bring in the two medical doctors who examined him and said that's a front-entrance wound, not a rear-entrance wound. Well, let's assume that your version is correct and that Cabrera-Cebarros was actually facing the robber when he was shot. The district court said that that doesn't help your client's case because that would simply reinforce the eyewitness identification, which he made at a lineup after the robbery, that that was the shooter, as opposed to I was running away at the time I was shot. It would reinforce the idea that he had not told the truth. It would be a different version of what happened. Most people aren't going to have a question in terms of how they're shot, whether it's in the front or the back. So the question then becomes why did his story change? What really happened? How could he lie about that? I mean, the problem I'm having with your argument is that if he was lying, it would be better to say I was facing the man that shot me rather than I was running away when he shot me through the thigh. Well, when we talk about why he's lying, I also want to couple that up with the money aspect, but what would be his— I mean, is it hard to figure out whether it came from the back of the leg, the point of entry? I mean, what was the caliber of this bullet? It was either .38 or .357, basically the same bullet. Oh, yeah. If you're hit by a bullet, generally the entry wound is smaller than the exit wound. And that's the declaration that Dr. Goldwer presented to the California Supreme Court. It basically says that was the basis of his conclusion. The jury had the photographs, right, that were taken, both front and back? I don't know if those photographs were admitted into evidence. Witnesses testified that they had looked at the photographs. Well, Thomas testified that he photographed the victim. Right, but I don't believe those photographs were admitted into evidence. Wasn't there testimony by the paramedic that the wounds were about the same size? He testified that before he took the stand, the prosecutor had asked him to look at the photographs. And he testified that after looking at the photographs, he wasn't sure which was the entrance and which was the exit, which is why I submit that if a jury had heard from the attending physicians at the emergency room, their opinion as to where the entrance wound was, it would have established or it should have established in the minds of the jury that the medical professionals thought that he had been shot in front of the leg. Well, but the problem I'm having with the argument is, as I understand it, the bullet that was recovered from, I believe it was the victim's body, was not a hollow point round, which is designed to expand when it hits. And a through and through wound, unless the slug actually hits bone or something hard inside the body, could easily enter and exit if all it tears is fat and muscle tissue. So it wouldn't be surprising in this particular case to find that the wound on entry and on exit is about the same size, right? One could speculate, but we don't have to. We've got photographs and we've got witnesses who saw the entry and exit wound, and there is no testimony that one was larger than the other, is there? Not from the witnesses who testified at trial. I'm talking about the witnesses who did not testify. But the medical records, even at Huntington, don't say that. They don't say one wound was larger than the other. They didn't measure them. They didn't photograph them. But the jury would have heard a doctor, possibly two doctors, say, in my medical opinion, that's where he was shot. And what difference does it make? I respectfully submit it goes to his credibility in terms of his description of what's going on in that parking lot. Didn't the pathologist who did the autopsy testify at trial? No. Okay. It was a reread of somebody else's report. Oh, I see. Okay. Now, the other thing, and perhaps the more important thing, though, is the testimony that our client robbed the victim. Now, again, evidence that was presented to the California Supreme Court included the following. The wife of the victim said her husband had $1,400 to $1,500 in his possession when he left the house that evening. The California Supreme Court received the investigative report from the lead investigator, Lee Barone, who said he interviewed the victim's brother a day or two after the incident. The victim was at that bar engaged in a high-stakes pool tournament where as much as $5,000 was being gambled on pool games. The California Supreme Court, of course, knew from the trial record that the manager of the bar said that the victim, while in the bar, was flashing a large sum of money. And when the victim left the bar, the doorman said he saw approximately $400 in the victim's front shirt pocket as he walked out the door shortly before this incident took place. The jury did not hear what the California Supreme Court had presented to it, a declaration from one of the first officers who arrived on the scene, Gilbert Ortiz, who said when he got to the crime scene, he saw the victim lying on the ground with a large wad of money in his possession, that he discussed this large wad of money with other officers and medical personnel that were at the scene and they decided to send the money, the shirt, and the jacket on to Huntington Memorial Hospital. Was his car taken? His car was taken by someone, yes. Well, there was testimony by Trado that shortly after he was shot, he heard a car start up and leave the parking lot and then we have a sheriff's deputy and a Pasadena police officer who testify that a man matching the description, roughly, of your client was seen driving Trado's car down to East Washington Boulevard within minutes of the shooting. What the testimony was, actually, was one officer, an officer Edwards, said he saw a white car, a large white car, black over white car, with a black man driving the car. The other officer, who was three blocks down the road riding parking tickets, saw what he thought was a Buick Regal with a black man wearing glasses. Now, I respectfully would submit that that's a reach to say that they were describing Trado's car or describing our client. But that's an issue for the jury to decide, right? It's circumstantial evidence. Your argument is it's very weak circumstantial evidence, but the fact is that the victim's car is gone and two witnesses right after the robbery see a car that could have been the victim's and a description that approximates your client fleeing from the scene of the crime. It puts its headlights off. Isn't that the testimony? I agree that it could go to wait for the jury in terms of whether or not that description would describe our client. But in the universe of people that live in Pasadena, it's a real reach. What is it, a little after 2 a.m. in the morning, so there are fewer people on the road at that hour? There are fewer people on the road, but to take a description that says the person is black and he's male and he possibly is wearing glasses and say that's Elbert Cunningham, who was wearing a three-piece purple suit at the time and had long curly hair, I don't think the description is such that you have a reasonable inference that that's the victim. But also, when Juan Ceballos testified, he said that the perpetrator of the crime stuck a gun into the face of Tredo and said, give me your money, not your car keys. He was after the cash. We know that Mr. Cunningham didn't drive his own car there because he was taking buses. And we know where the car eventually was recovered. In Compton, not far from his grandmother and where his wife lived. It was found in Compton, 1.97 miles from where his ex-wife lived. It was found 1.12 miles from where his grandmother lived. Again, it's all circumstantial evidence. I agree with you. And it was found a couple of blocks from where the brother of Juan Ceballos, the witness in this case, lived. And that evidence was also before the California... No, Mr. Ceballos didn't drive it there. His brother could have. Did his brother say that to the detective or are we speculating that? We're speculating. Okay. But I don't think it's that much more of a reach than to say because the car is in Compton, within two miles of the grandmother or one mile from the ex-wife, that that necessarily is a reasonable inference that my client took the car, drove it there and left it. I guess going back to the AEDPA standard, though, this evidence was all before the California Supreme Court. Right. And the jury convicted on the basis of this evidence. And the California Supreme Court upheld it. And your burden is to convince us by clear and convincing evidence that that was an erroneous determination of the fact. And I'm suggesting that that's the case. When you have one witness, again, when you have a one witness case and the issue is just the credibility of that witness. There's only one eyewitness. I'll grant you that. No question about that. But there's a lot of circumstantial evidence here. You've got the testimony of the bouncer and the manager at the pair of aces who identify your client as being there. You've got the bartender at Ricky's down the street identifying your client as being in the vicinity of the crime. You've got the circumstantial evidence of the two officers who saw the victims, what may have been the victims' car being driven away. So you can't – I mean, the jury heard all that. That's all part of the mix that they have to consider, isn't it? Well, but the jury didn't hear that the victim had the $400 he was seen leaving the bar with in his pocket when he was found at the scene of the crime. And that money was transferred with his body to the hospital. Wasn't there a reference to that money that was contained in the property receipt from the coroner that was introduced into evidence at trial? There was. But the defense counsel never pointed that out. Defense counsel were unaware of it. Defense counsel didn't apparently look at those documents and bring that to the attention of the jury. That's the problem. And so the jury did not hear that there was a different version of how he was shot and that evidence was available. Trial counsel didn't put their hands on it. It was presented to the California Supreme Court. There's a question whether or not a robbery even took place. If the amount of money that he had in his pocket was identified as he left $400 and that same amount of money winds up. You would concede, though, that if the jury concluded that the robber took the victim's car, that that would in law be sufficient to constitute the deprivation of property from the victim. I'm not willing to concede that under the felony murder rule, because if he robbed the victim of the money, if his intent was to take the money from the victim. That would be felony murder robbery in the course of a murder. The victim was putting his car keys into the door at the time. That's not that's not my understanding of the record. The two of them were standing there when the car when when my client showed up, if he takes a car after he commits the murder. But the taking of the car was not his intent in terms of the murder. It was taking the money. And I don't think the felony murder rule is going to apply here. If it's simply because as an afterthought, he took a car. Well, OK, but suppose that the jury credited the version, which I thought I read in the record, that the victim was basically about to open the door of his car when the robber approached and he was holding his car keys. I don't recall anything in the record that says he was holding his car keys in his hand. He was he was at he was at he was in the parking lot. He was intending to leave. Mr. Mr. Barrow said his whole purpose of being there was to prevent him from getting into this car because he was too drunk to drive. He came back to take him home. But then Trado was insisting that, no, he would drive. Right. Right. Right. But I don't recall in the record. There's anything we can certainly. Yeah. But again, if there was no if there was no robbery in the sense of the money, in fact, was not taken. Now, wasn't there was some money found on the ground. There were scattered at the victim's feet. The shoe was off. There was eight one dollar bills that were found in a passpocket of the victim that was pulled in and documented by the property officer, Officer Thomas. And there was a one dollar bill, some loose change amounting to two dollars and two cents that was on the ground. And his shoe was off. And his shoe was off. And there was testimony that he kept money in various parts of his body. In his pockets. His wife specifically said he didn't put money in his wallet. It was he put it in his pockets. About his shoe. I thought there was some. His shoe was off. I understand that. But I thought that there was testimony that he might carry money in his shoe as well. My recollection of the testimony of the wife is that he stuck the money into his pockets, but not into his wallet. I don't recall her saying sticking the money into his shoe. But again, the jury was told that the money was missing. The prosecutor made a big deal out of the fact that the money was gone. It was gone to the hospital. And the records established that fact. Trial counsel didn't bring that out, but that evidence was submitted to the California Supreme Court. Now, I'm going to be running short of time here. So just briefly with respect to the penalty phase IAC claim. The California Supreme Court had the declarations from trial counsel saying we didn't prepare a penalty phase defense because we didn't think we'd lose the case. And in point of fact, the only thing they really did, other than they received some letters or some names of witnesses to contact from the petitioner, and apparently some letters were sent out, but they never bothered to follow up on interviewing any of these people. The preparation at the penalty phase was to meet with the petitioner in the marshal's lockup one day before the penalty phase started and to interview him for an hour to two hours. And I would respectfully submit that's below the performance standard. With respect to the prejudice, we've set forth- What about Dr. Vickery's report? Dr. Vickery. Vickery. Right. They never read it. One of the attorneys said he got it. He didn't think it was helpful. The attorney who put on the penalty phase said he never even saw it, that the other attorney had told him it wasn't helpful. So they put on, after one or two hours of preparation, they put on a petitioner, his mother, a friend of his mother who was a minister who was opposed to the death penalty, and a custodian of records from a temporary employment agency. That was the presentation. And we've set forth the mitigation evidence in the brief, and that's obviously a call on your part that we submit that there's certainly a reasonable probability in this case, but for the ineffective assistance of counsel, that a jury, any juror there, might have had a different opinion in terms of both guilt and penalty. And respectfully, you can't have confidence in this verdict with all this evidence not being presented to a jury. Thank you. Thank you. Norman James. Good morning, Your Honors. Good morning, Judge. I remember you. Yes, Your Honor. I was in the U.S. Attorney's Office many years ago. It was a fun time. It was a fun time. Here's another form of U.S. Attorney. Yes, I know. I'm covering all the other claims. I wanted to address the misconduct. Are you in Montana? Yes, now I am. Where do you live up there? In the Bitterroot Valley in western Montana, down from Geyser. Bitterroot. In the valley. It's quiet there. Oh, it's nice. They've got nice names there. Bitterroot Valley. Yes. Hell's Gate. High school is called Hell's Gate High School. Hell's Gate High School, yes. Missoula. Missoula. I spent a lot of time in Missoula. It's a nice town. Then you go down to Helena, and the courthouse is located at the end of Last Chance Gulch. Oh. It gives everybody a lot of comfort. And the courthouse is tilted a little bit, too. I had trouble with a contractor. I think they demolished it. Anyway. I wanted to address the misconduct claims, for which I guess there are some procedural problems. But I did want to mention that the clear impression the jury was given about this case, the government's theory, and you can tell from the record, is pretty simple. Trayto's in the bar. Trayto leaves the bar with money in his pocket. A few minutes later, Trayto's out in the parking lot. Cunningham approaches him, says, give me your money, and shoots him. And a few minutes later, not long thereafter, here comes the police, and they find him with no money. That's what the jury heard. Clearly, the impression they wanted to give was that the money he had on him that the bouncer saw when he left was gone. And that was the whole reason. That's what happened in the parking lot. A very simple circumstance. What we are suggesting is missing here is that there was evidence that throws substantial doubt on what did happen in the parking lot. The only person who said what did happen in the parking lot was Juan Cerberus. He's the only person who testified and who claimed to know what happened. We suggest that there was a lot of evidence that wasn't presented to the jury that threw doubt on that as to what happened. We don't know what happened. Well, as you, I think, alluded to a moment ago, the California Supreme Court found that that claim was barred with regard to the 455, right? No, they did not. The California Supreme Court did not. You said there was some procedural. Well, the district court held, although it went on to rule against the misconduct claim. Yeah, I'm trying to figure out which misconduct claim are you talking about? Claims one and two. One and two. Claims one and two. Not the appearance misconduct or the argument misconduct, but claims one and two, which pertain to one, the medical records, and two, the money. The money is the more serious of these, in my estimation, because of the testimony of Thomas that was put on by this prosecutor. She knew that $455.25 or whatever it was had been found on this victim, and yet Thomas was brought in to testify in a very carefully done way, if you've seen it, that nothing was found, the $8 in the pants, the chains on the pavement. He says when he arrived, the EMS was working on him, incidentally. The pants were pulled down. The shoe was off. That could have happened by just the EMS working on him, but in any event, the way Thomas described it and the jury got it was, he's out in the parking lot, Thomas is, shortly after the robbery, and the money's gone. In fact, the money was not gone. It was found by Officer Ortiz, as was a gold chain. Those were sent to the hospital, where Ortiz receded the money over to the coroner, and he took the jacket. The point was the jury didn't know that. What happened to the other $1,000? There's no evidence there was any other $1,000, Your Honor. Well, we know that he had $1,400 to $1,500 earlier in the evening. Well, we don't know that. Well, that's what the wife testified. The wife said that ordinarily, she speculated he probably would have had that amount because he had a job that day, and he usually had $1,400 or $1,500. Let's assume that the jury concluded that early in the day he had $1,400 or $1,500. Was there any testimony with regard to whether he won or lost any additional money playing pool? No. And there was testimony available that wasn't put on that there were high-stakes gambling going on. There's no way to know, Your Honor. Really, he was there all evening, Trayto was. He was taking cocaine. He was drinking. He was playing pool. There's no way to know other than this. What the jury heard and what the prosecutor wanted the jury to understand was he did have over $400 in his shirt pocket when he left, and that was gone in the parking lot after the robbery. That's what they were trying to understand. That certainly provides, I guess, I don't know what you'd call it, notice to a would-be robber that there's a victim who's got a wad of cash in his front shirt pocket. Right, and it was there after the robbery. And the ground being Borg is very much like this. Well, the question I'm asking you is if the jury thought that there might have been more money on the victim, why wouldn't that be consistent with a theory that the robber didn't get all the money, we know he didn't, that was on Trayto at the time of the robbery? Your position is the robber got nothing, right? No, my position is that there's substantial reason to believe there wasn't a robbery, that it wasn't a robbery. He had a drug deal that went bad. The whole idea of the robbery was he left with the money, he shot, and the money's gone. That was the robbery. Well, I guess the question I'm asking was if there was testimony that there were $1,400 or $1,500 earlier in the evening, even with the $455, why couldn't the jury have concluded that the robber didn't get all of the victim's money but he got some of it? Well, perhaps so, but the problem was that the jury, as well as the defendant, as well as the prosecution, in my belief, was entitled to know the facts of this case. This was a death penalty case, a murder case, and the central critical fact in a robbery, murder, that the victim left the bottle of cash that was found on him after the shooting was not put before the jury.  And they were left with the exact opposite impression through what I regard as covert perjury, and that was Thomas' impression given to the jury that the money was gone, when in fact it was not gone. And it's interesting that Officer Ortiz found that money, found the gold chain. He talked to other police officers and the EMS people about what to do with it, whether to send it to the hospital or not. Well, who did he talk to? How on earth could that not have gotten into evidence? How on earth could that, the prosecutor put on Thomas, and those documents were in her records, she knew of it. How could you put on Thomas to testify and let the jury believe that this money was gone when in fact it wasn't? That's, you know, I think the jury was entitled to hear that. Now, would that have persuaded them? I don't know, but surely in a case like this, they were entitled to hear it and not have a false case presented to them is the point. They were entitled to more. They were entitled to know, you know, as far as the shooting through the front and all that. Our view is that in this case, the jury should have heard this evidence. For example, if you're trying to decide is the shooting from the front or the back and was Sir Barrows really running away or was he not? There were two doctors and a nurse who for whatever weight you want to give to their testimony could have testified to their opinion on that, and the jury had not any idea that that was the case. Instead, what did they hear? Thomas testifying, well, he thought it was from the front or the back, but yeah, he's a police officer. It's not his expertise, and he could be wrong. And English changing his mind and saying, well, I thought it was from the front or the back, but two years later, I'm not sure. When we had two other doctors and a nurse who could have provided testimony. This is supposed to be, as the prosecutor in her closing argument ironically put, she's there to tell you what the truth is, while the defense was there to present smoke and mirrors. Well, they didn't get the truth or weren't allowed to arrive at the truth based on evidence that should have been before them. And that's what our belief is about misconduct, was Thomas, whether he knew or not, we're not saying he did, that he perjured himself. But it's what has been called covert perjury in Hays v. Brown. And I know your honors in the dissent in that also agree that this is a pretty egregious thing to put even a false impression before a jury. And there's no question that Thomas gave a false impression as to what happened. And we would argue also that if you combine that, that has a higher standard. It is the Chapman standard, beyond a reasonable doubt. The government has the burden. That's different from strickling. And additionally, it's to be considered, we believe, communal to community. Oh, I can't think of the word right now. With the misconduct and the appearance thing. Now, that alone we don't suggest. Yes, thank you, your honor. That alone we're not suggesting is enough to bring about a reversal. But she did argue this gold tooth thing when she knew. And the California Supreme Court, oddly, I thought, found that, yes, she probably did succeed in persuading the jury that he had changed his appearance deliberately for purposes of the trial. But it would have been improper had she known that the sole reason for the tooth being removed was medical. I thought that was one that the California Supreme Court did find was procedurally barred for failure to make an objection, a contemporaneous objection. They did, and that's why we've combined four and eight, which is the IAC. How do we reach it if it's procedurally barred? Well, I think we put in our brief, and we didn't have room to put a lot, but I think, I can't remember what footnote it is, but we do not believe that is the case, that it wasn't procedurally barred for failure to object, that the California Supreme Court had not, had left it open for courts of appeal to consider such error, even without an objection, such that it was not a procedural bar that would be recognized in the federal courts. I think that's in the footnote in the reply brief. Oh, we can find it, that's all right. Is there any, I don't know if there's questions on the remaining claims. How about the competence of counsel, are you going to talk about that? Well, Mr. Dutton handled the IAC. Well, it's here, we have it. Pardon me? It's here, we have it. Yes, yes. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Senior Assistant Attorney General Lance Winters for the Warden and Respondents in this case. Petitioner in this case has failed to fill his burden to show that the California Supreme Court unreasonably applied Supreme Court precedent in rejecting these claims. He never passed the threshold of 2254-D, that's what the district court found in this case, and the district court's conclusion was proper. As to the claims of ineffective assistance of counsel, first addressing the gunshot wound, as has previously been discussed, this was an issue that was thoroughly vetted at trial. Sean English testified that the front of the leg had been written down in his report as being the entry wound and Officer Thomas similarly testified. But Officer Thomas explained that he didn't examine the wounds for this kind of consideration, he was simply taking photographs. In fact, Officer Thomas said that the murder victim had an exit wound at the back and had an entry wound at the front. But the murder victim didn't have an exit wound at all. It recovered a slug from inside the body. So clearly Officer Thomas was not engaging in a thorough analysis. And Paramedic English similarly said that he assumed that the front of the leg was the entry wound from the story he had heard at the scene, which was two men were standing next to each other, they were robbed, and that the murder victim was shot in the front of the chest. Therefore, he assumed that the front of the leg was the entry wound. Upon examining photographs, he then further explained... The front of the leg of the other person. The other person was shot in the chest. The murder victim was shot in the chest. So the fleeing victim, the attempted murder victim, was shot in the back of the leg. He was shot as he was fleeing the scene. And Paramedic English explained he didn't get this from Juan Sparrows because Juan Sparrows didn't speak English and Paramedic English didn't speak Spanish. So there was an explanation of these things in the report already. Further, there was testimony from Deputy Hawkins that he would expect an exit and entry wound from such a caliber as this, a .357, to be quite similar, especially if it's not a hollow-tipped bullet. He said maybe you could examine the clothes, but that wasn't done in this case. And the coroner testified that the only person qualified to offer an opinion as to the entry or exit wound would be a forensic pathologist. And none testified at this trial. And to clarify one point, I believe that Paramedic English did examine the photographs of the leg entry and exit wounds, or the front and the back of the leg, whichever they were, and those exhibits, those photographs were admitted at trial. So the jury had that before them. Petitioner now wants to say that additional evidence from Nurse Rogers and Dr. Goldweber that they could have opined at that time that they... I thought I heard you say that the bullet was recovered. No, the bullet... In the body, it was still embedded. Only for the murder victim. There's the murder victim, Carmen Tredo, and then there's the attempted murder victim, Juan Cebreros. The murder victim was shot in the chest, bullet recovered. The attempted murder, Juan Cebreros, shot while fleeing, threw and threw gunshot wound through the leg. Well, I misunderstood you. But as both Drs. Goldweber and Nurse Rogers, again, they would have simply opined that they would have added to this cumulative evidence, and as further shown in federal discovery, when Nurse Rogers, Dr. Goldweber, and paramedic English were all deposed, they said determining entry wounds is not important. Can we consider that? That's why we asked for the supplemental briefing on the effect of the pinholster. It's not part of the 2254-D analysis, no. So how can we... I guess the question is can we consider it at all? I thought the briefs from both parties said we agree pinholster controls, you can't. That is correct. Why are you arguing to us evidence that we're not supposed to consider? Well, I think it merely corroborates the conclusion of the California Supreme Court. I know what it says, but I think the Supreme Court is telling us, no, you can't look at that. I agree. The only time you would look at that is if you were to conclude that the petitioner satisfied the 2254-D threshold. If petitioner had shown that the California Supreme Court's rejection was unreasonable, then you would engage in a de novo review, and then you would consider that evidence. And the district court alternatively reached, in this case, the conclusion that there was no relief merited, even under a de novo review. So that would be one instance where the court could consider it. But as you point out, and as is my position, they don't satisfy a 2254-D in this case. What about the money? Well, as to the money, there is evidence. It was unequivocal testimony that the murder victim had $1,400 or $1,500. The wife was asked at trial, do you know how much he'd been paid? Not exactly, but he had $1,400 or $1,500 on him. There's nothing hedging about that. Well, he had been gambling. Well, there was no evidence admitted at trial that there was any gambling going on. That was alleged as part of the state habeas petition, but in terms of what the difference at trial would have been, in terms of introducing additional evidence about this money, there's no evidence of gambling going on. Furthermore, there was evidence. Well, does that go to the competence of counsel then? Yes, all this has to go to the competence of counsel. Absolutely. And furthermore, there was testimony at page 2178 that the victim did keep money in his wallet. So, the circumstances are... But didn't the security guy there say he saw a certain amount of money in his pocket when he left? Yes, he said he saw about $400 in $150 bills. And Officer Ortiz, in their declaration, said that there was a thick wad of money on the body. Well, a thick wad is not $400 and $50 and $100. So, this suggests that there's at least two different sums of money, which corroborates the murder victim's wife's testimony that the murder victim kept his money in different places on the body, one of which being in his wallet. So, he left home with money. He's at the bar with money. Petitioner comes up and demands money from him. Says, hey, amigo, give me the money. This is a .357 Magnum. And then the evidence at the scene suggests that money was taken. His shoe is removed. There's small bills and change on the ground. His car is taken. Well, the other side says that when the paramedics got there, that they removed his trousers and perhaps his shoes. No, I don't believe that's correct, Your Honor. I believe when the victim was found, his shoe had already been removed. The paramedics might have removed his other shoe and removed his trousers to treat him. But when the murder victim was found, one shoe was removed. So, this would be the testimony of the first responding Pasadena police officer. I believe that's correct. That was Ortiz. He's the first officer. Let me see if I have that. In any event, the police got there before the paramedics. Is that right? I believe that is correct, yes. All of this evidence shows that even if Petitioner's counsel had introduced additional evidence that money had been found on the body, that the jury would have still concluded that a robbery occurred. He took the victim's – he took some of the victim's money, at the very least, and he took the victim's car. In fact, as Your Honor earlier asked, there was testimony that the murder victim was bending down to open his car. Was the jury told that he was carrying $1,400? Yes. That was part of the testimony admitted at the trial. But the jury wasn't told that this money was found on his body. Well, there was no testimony about it, but it was admitted into evidence. The documentary evidence that Petitioner relies on is a hospital medical record and a receipt from the coroner, both of which were admitted as exhibits at trial. So, no, there was no testimony about it, but the jury did have that evidence before them. And the admitted exhibits went back to the jury during deliberations? Sure. They had full access to all the exhibits. Okay. And is there any reason why the prosecutor didn't bring that back to the attention of the jury? Well, I think the prosecutor's position was that even if some money was taken that some – excuse me, even if some money was found on the body, some money was taken, and therefore a robbery occurred. And that was a reasonable interpretation of the evidence. Well, did she tell that to the jury? She argued to the jury that there was testimony that there had been two separate amounts of money testified to, that the murder victim had two separate amounts of money. He had a thick wad of bills and he had $400 in small bills – or in large bills, excuse me. That was a wad. Well, no. If it's $400 and they're in 50s and 100s, it's not a wad of cash. Sounds like a wad to me. It's not a thick wad. Let's put it that way. But didn't she take pieces of paper from the court reporter and – That's exactly what she did. Show the jury if you had three $100 bills and two 50s, here's what it would look like, and it's not a wad. It's not a thick wad of money. And the thick wad wasn't found. That was her position at trial. Now, Petitioner's evidence that Officer Ortiz, his declaration, which was found after the trial, was that it was actually a thick wad that was found, not large bills. But there's no evidence the prosecutor knew that. In fact – Well, didn't the prosecutor consider to have knowledge of what the investigators, police officers, Yes, absolutely, in terms of their Brady obligation. So technically the fact that the money that was found on the body was a thick wad was something that the prosecution may not have turned over. But they did turn over the fact that money, $455, was found on the body. That was a Brady violation. The nature of the thickness of the money? Well, it should have been turned over, but it wasn't material. So there was no Brady violation. But I hear that all the time. You know, did we just get a decision from the Supreme Court on all the material that was withheld that was Brady information that involved the senator from Alaska? I'm not familiar with that decision, Your Honor. Well, Your Honor, read it. It's a pretty good Supreme Court decision. And that decision was reversed, and the case was dismissed, and the senator's life was ruined. So he's been rehabilitated, but he's now dead. Well, in this case – There's a lack of respect for Brady. Well, in this case, the district court found that, for instance, the documents showing that money had been found on the body had been turned over. The district court found that the documents showing that Juan Sobrero's medical records suggesting that the front of the leg was an injury wound were turned over. But the California Supreme Court could have reasonably rejected those claims on the basis that they weren't material, for the same reason that counsel was not ineffective. Is that what they said, that the claims were immaterial? Well, the California Supreme Court simply denied it, saying that the claims were denied on merits. There was no further explanation of these claims as they were raised in state habeas. There was evidence that when the murder victim was – But Judge Gould was – I'm sorry, Your Honor. But was there no evidence the large bills were found on him? There was no evidence – Well, there was no evidence admitted at trial that – of the denomination of the bills. Simply the medical records and the coroner's records that it was $455.25. But it sounds like from what was said earlier about $400 in big bills, that the large wad was more likely the $400. Because – I'm sorry, the large wad was likely what else he had. The $400 would not be large. That's correct. And that was the prosecutor's theory. That was what the prosecutor argued. She argued that the thick wad of money was missing, based on what she had in terms of the evidence and the records at that time. But in addition to the money, there was also the car, as Your Honor earlier mentioned. Lord Ortiz said that he saw a big wad. Yes. And in his declaration presented on state habeas, he said that the money they found was a thick wad. And now you're saying it was not a thick wad. No, I'm saying that the prosecutor argued that the thick wad had been taken based on the information that was known to her at the time. So in terms of a misconduct claim, which Petitioner has also tried to raise, there's no misconduct here because there's no knowledge on the part of the prosecutor that she was arguing any false evidence. Yeah, but she's charged with knowledge of the investigator. In terms of who? I'm sorry, Your Honor, go ahead. She's charged with that knowledge. Certainly in terms of that. That's not like we see these cases where you've got a police officer and they have this Brady material and they tuck it in their drawer and close the door and forget about it. A prosecutor is charged with the knowledge of their officers in terms of their Brady obligations. That's absolutely true. In terms of presenting false evidence or misconduct, there is a knowledge requirement. The knowledge requirement, isn't that satisfied with what Ortiz put down in the report? No, absolutely not, because Ortiz never wrote a report talking about finding any money. There is nothing in the record from Ortiz that he ever filed a report. So the thick wad comment comes from the subsequent declaration that didn't exist until the State Habeas Procedure. Absolutely. There was no contemporaneous document that she would have been aware of. Correct. Because he didn't prepare a report. Absolutely. Ortiz didn't prepare a report. That's correct. Well, let me correct that. He may have prepared a report, but there was no report mentioning this. He wrote the offense report, didn't he? Wasn't he the first officer on the scene? I don't recall, Your Honor. Thomas wrote the report regarding whatever evidence there was that he collected. That he collected. I can't remember. So he had that knowledge, and he didn't write it down. That's correct. So it can't be attributed to the prosecutor. That's correct. Not in terms of a misconduct claim. There was, as far as the car, I just want to correct one point. There was testimony that the victim was getting into his car with his car keys at the time when Petitioner approached him. And that's at 2342 and 2347 of the record. And as Your Honor mentioned, there was testimony that circumstantial evidence that someone matching Petitioner's description was seen driving away from the scene of the murder in this case, shortly after the time of the murder, which is 2 a.m., so not a lot of cars on the road. And he's driving without his lights on, and he's driving in the direction of his home, which is 2 miles away from where the murder occurred. So why did the police stop him? Well, at that time, they didn't have any description of who. But, I mean, the guy is driving around in the middle of the night with no lights on. Don't they stop people for that? Well, they do, except probably when they're on their way to a murder scene. And that probably took precedence for them. One of the officers was on foot, right? I believe that's correct. He wasn't actually in his patrol car at the time. And the other officer was dispatched. He was the primary officer dispatched to the reported shooting. Right. He was dispatched to go to the shooting. So he's not going to stop to pull over someone without their lights on until he gets further information. As to Petitioner's misconduct claim with regard to the money and the gunshot wound, there was this misconduct claim or manipulation of evidence or giving a false impression, this was never presented to the California Supreme Court, nor was it presented in the operative pleading in this case, the First Amendment petition. And that's the little procedural problems that Petitioner's counsel referred to. And the district court found that this claim was not properly before it because of those procedural problems. Well, let me ask you this. Victory, his statement, which is exhibit number 11 that I have, is pretty strong, isn't it? About the reflection of the competence of these lawyers? I disagree. Never called him. I mean, he goes through. I don't remember reading a report or a letter that was this thorough. I respectfully disagree, Your Honor. You don't have to be respectful. Well, I choose to be, Your Honor. The declaration and report of Dr. Vickery, I think, demonstrates neither deficient performance nor prejudice. Mr. Yudovic, one of Petitioner's counsel, got a report from Dr. Vickery. He read the report and concluded that it wasn't useful. That's what his co-counsel said in his declaration, essentially, that was presented on state habeas to the California Supreme Court. That's pretty powerful evidence of his incompetence, wouldn't you say? I disagree when you look at the report because the report talks about how Petitioner had a proclivity for storing frustrations until hostile, aggressive outbursts occurred. And they had a tendency for temper outbursts or aggressive outbursts when drinking. I'm talking about his – are you looking at his declaration? I was talking about his original report. Oh, he's saying that had these folks come over and given him the information he needed in order to really do a thorough job, and he thought he had it all, but he didn't. And he goes through in this letter. I thought it was a pretty powerful letter. Not as compared to the evidence that was already presented, Your Honor. For instance, Dr. Vickery – You never know in these trials what's going to make the turn. I mean, maybe that's why the fact that the cash that was on the victim's body wasn't turned in. Well, never know is not the standard, Your Honor. It's a reasonable probability of a different result. That's what Strickland says. Yeah, well, isn't there a reasonable probability here? Well, you take some of – If Vickery had testified – I'm talking about the penalty phase. Of course. If Vickery had testified to what he put in this letter, why isn't there a reasonable probability that the penalty would have been life without the possibility of parole? Well, for instance, Dr. Vickery testified – Well, Petitioner and his mother testified at trial that he had been abused as a child. His stepfather had beaten him. His father was an alcoholic, a pimp, and a gambler and raised him for part of the time as well, and that he had been sexually molested while with his father and that he had been abused with his father, that he had also used alcohol and drugs at various times of his life, that no one ever really took care of him, that he was raised by a bunch of different people. That evidence was admitted at trial. To then say to the jury, and that was dysfunctional, doesn't really add a lot, Your Honor. I think it's fairly obvious that his family was dysfunctional. Similarly, you know, when Dr. Vickery said that he had – Did the prosecution admit or go along with that dysfunctional description? I don't think they disputed it. They didn't dispute the things that happened to him in his early childhood. No, but what – he talks about a lot of other things other than dysfunctional in this letter. Sure. And what – he's testified in how many cases? Five hundred? That's a figure I recall. He testified in many cases, including Melendez's case. But the – you know, other things he talks about were his problems being related to substances. What did Melendez get to with this? Well, you mentioned that he had testified in many other cases. I just noted that he testified in that case. Why did you pick out Melendez? Menendez. Menendez. I mean, those two brothers. That was because in that case, he was found to have committed misconduct. Who? Vickery. I see. He also testified – or in his declaration, he also talks about petitioner's problems being related to substance abuse. But that's not necessarily mitigating. And there was evidence that most of his crimes had no relation to substance abuse. There was no evidence that he was drunk or intoxicated in a murder in this case. He was also involved in a prior assault on two police officers where he attempted to shoot at them. And basically, it was an attempted murder case. There was no evidence of any intoxication there. There was also the forcible attempted sodomy of another inmate while he was pending trial in this case. He's a bad guy. And the jury heard all that evidence. Yeah. And a few extra details from Dr. Vickery that his family was dysfunctional and that he had problems with substance abuse would have paled in comparison to this aggravating evidence, especially when most of his mitigating evidence was already presented in great detail. And that's why there's no reasonable probability of a different result had Dr. Vickery testified. You never know. You never know. You never know what a jury's going to do. Well, I think, as stated before, we have to look at what there's a reasonable probability of what a jury might do. And in this case, there's simply no reasonable probability. I mean, if you look at the California Supreme Court was faced with an instance where a petitioner who was an African-American male walks into an all-Hispanic bar, is wearing a three-piece maroon suit, and has Jerry Crow glasses and goatee, and a gold tooth at the front of his face. He stuck out like a sore thumb. There was no mistaking that he was the individual who was at the scene of this crime. He left Ricky's bar moments before the murder occurred. There's no dispute of the fact that he was at that bar. Right. Only that he was the murderer. And, in fact, Dr. Vickery's testimony would have explained why he was the murderer, not that he was innocent. It would have contradicted their theory of innocence in the first place. It would have explained why he killed the victim. I'm talking about the penalty phase. Yes. As am I, Your Honor. Yeah. And Dr. Vickery's testimony would have undercut their theory of innocence, which they carried through the penalty phase. And that would not have been helpful to the petitioner's case. It would have been damaging, as well as all the other damaging conclusions that would have come out through Dr. Vickery's testimony. And especially when considered the negatives from his testimony, the relative weak positives, and the extremely aggravating evidence that was admitted. There's simply the California Supreme Court's conclusion that there was no prejudice, there's no reasonable probability a juror would have reached a different result. It's not an unreasonable application of strict one. Unless the Court has any other questions, I'll submit. All right. I have no other questions. Judge Pragerson, although the appellants may be over time, I would appreciate it if you'd let them argue for two minutes on reply relating to the IAC on the penalty phase. Oh, yes. That's what I'm interested in. Sure. You'll have to excuse me, Judge Gould. From my position at my table, I didn't hear the entire question. Judge Gould asked me to let you speak a little longer on the penalty phase. That's what he's talking about. In other words, we're interested in that. Well, on the penalty phase, and I'm arguing that the Supreme Court's application of strict one was unreasonable. We had testimony from the Supreme Court was presented evidence from the trial lawyers who said on the performance prong that we didn't prepare for the penalty phase because we didn't think we'd lose. What they did do, one lawyer, Michael Yudevich, sent out some form letters to some people that had been mentioned by the petitioner as potential witnesses. But he never followed up and discussed or interviewed or talked to these witnesses. Dr. Vickery was tasked to prepare his report after the guilt phase had ended and, I believe, just before the jury had reached its verdict, or it could have been the same time that the jury had reached its verdict. It was July 28th, and I'm not exactly sure how that fits in the time sequence, but I believe that was after the guilt phase. So on July 28th, he's tasked to go out and interview the petitioner and prepare his report. He finishes his report on July 24th, which happens to be, I believe, the last day of the penalty phase. And the trial lawyer takes the report, looks at it, says it's of no use and doesn't show it to the other attorney. The only preparation they did do under the performance prong is they sat down in the sheriff's lockup for one to two hours, the day before they put the petitioner on the witness stand, interviewed him and then put him up. They had not subpoenaed any records, any documents, anything to corroborate his story. So when the jury heard his story during the penalty phase, it was unsubstantiated. It was cold. There was nothing to back it up. That was the performance prong. With respect to the prejudice prong, I think Judge Preggerson has pointed out, and Dr. Vickery's reports, the reports of family members, the reports of correctional officers were all put together in a package and submitted to the California Supreme Court. And prejudice is an interesting legal concept. It's sort of in the eye of the beholder. But the question here, though, is, is there a reasonable probability that one of these jurors might have said, well, you know, maybe that this isn't a case where we should institute the death penalty? Is there a reasonable probability that one juror who would have heard the information that the California Supreme Court had would have said, I'm not going to vote for death? If I could just take a minute or two of the course. Go ahead. I wanted to get back to this idea. This is a death penalty case. Thank you, Your Honor. I want to get back to what is a real red herring in this case, and that's the wad of money or the wads of money. As we set forth, when Maria Trato was interviewed, she was, I think, the first witness at trial. She talked about her husband having $1,400 to $1,500. And counsel for respondents just gave you a reference in the reporter's transcript to the effect that Trato carried money in his wallet, and his wallet was empty at the time of the crime when the police showed up at the crime scene. I'd like to give you another reference. It's on volume 13 of the reporter's transcript, pages 2153 through 54. Maria Trato specifically said on the witness stand that her husband did not put money in his wallet. He put it in his pockets. So where did the two-wad theory come up? The prosecutor took the testimony of Angel Gallegos, the bar manager, who said that during the course of the evening, and Trato was at this bar probably for four or five hours, during the course of the evening he was flashing a thick roll of money. And she said, or flashing, he didn't use the word wad. He said he was flashing his money. And she asked him, was it a thick wad of money? And he said yes. And she said, was it about this thick, indicating maybe one or two inches? And he said yes. So that's the so-called origin of the thick wad. Later on, at the end of the evening, which again, that trial counsel put this evidence in because it was in Officer Barone's report, after the victim had spent four or five hours in this pool tournament gambling, when he was seeing You say gambling, but did the jury hear the word gambling? No. The jury never heard from Officer Barone. The jury never saw that report, and trial counsel never subpoenaed the victim's brother who gave the information to Officer Barone that this illegal pool tournament with a stakes of up to $5,000 a game was being played in that bar that night. Where does this come from? I'm worried about the pinholster issue. Are you telling me things that you learned during the discussion? This was Exhibit J to Terry Todd's declaration before the California Supreme Court. So this was before the California Supreme Court. Absolutely. So at the end of this evening, when the barman, the doorman, whose name is Hunoval Gallegos, when he sees Treto leave the bar at 2 o'clock, now he's got the $400 or $500 in his pocket, and he describes it as hundreds and fifties. Well, hundreds and fifties, $400, probably wouldn't be a two-inch stack of money. But that presupposes that he went to the bar with $1,400 or $1,500 that night and kept it all, and that when he left that night, if he had $400 or $500 in his front-chair pocket, then because he hadn't spent any money all night, he's got the rest of it in his other pockets. That's where the two-watt theory came up. And respectfully, we would argue that's smoke and mirrors by the prosecutor in her final argument. Well, I mean, it's still, if there was testimony from the wife that earlier he had $1,400 to $1,500 and testimony from Angel Gallegos that he saw him in possession of a thick wad of money, that's a classic jury issue. Right, but Angel Gallegos, well, I agree. I'm not giving the final argument here. But with respect to what happened, when he left, he was only seen with $400. The prosecutor argued there were two wads of money. We would respectfully submit trial counsel should have said, wait, when he left, there was $400. And that was described by Officer Ortiz as a thick wad of money when he found the victim in the parking lot.  Now, the word thick is not the most definitive and most descriptive term in the world, but that's what happened. Now, to show the confusion in this, if you look at the respondent's brief at page 31, respondent writes on the brief that petitioner took the money from the shirt pocket but left the thick wad of money on Trayto's body. Now, that's the position they took in their brief. But we know the money from the shirt pocket was the money that went to the hospital. So if, in fact, then the petitioner left the thick wad on the victim's body, why didn't that appear in Thomas' report? Where did the money go? Counsel, Judge Gould, how do you know, as you just said, that the money in the pocket is the money that went to the hospital? It's an inference you have to draw as follows. Shortly before the crime takes place, the bouncer, Junibal Gallegos, sees the victim leave with $400, approximately $400, in his front shirt pocket. I thought he said that $400 was in large bills. He said in hundreds and fifties, that's correct. But he said it was in the front shirt pocket. When Officer Ortiz arrived at the scene, and this is in the declaration he submitted to the state court, he said he saw the victim with a thick wad of money in his possession. And he discussed what to do with the money. But he didn't say in his pocket, did he? No. Or did he? But what he says in his declaration. And he says, excuse me just one second. He said, I recall that Mr. Traito had a significant amount of cash on him. I do not recall where on his body the money was found, but I do recall that it was a thick wad of bills. I took custody of Mr. Traito's shirt and jacket. But after a discussion amongst the officers and medical personnel, it was decided that the money should remain with the body for the coroner's office to handle. So the shirt, the jacket, and the money were all sent to the hospital. And then Officer Ortiz receives the shirt and jacket back. I'm saying that the only inference there you could draw is that the money was in the shirt or the jacket. And that's why he sent all three items to the hospital. Well, couldn't you also draw an inference that he had $400 in thick bills, I mean in big bills, in his pocket that were taken, that were no longer there. And he had a thick wad in his jacket of $400 in smaller bills that is what was found by the officer. Excuse me. You could make that argument, Judge Gould, but to make that argument you would have to say that the petitioner, during the course of a robbery, shot the victim, left the money, the thick wad that Ortiz described, in the front shirt pocket, which was in plain view when he left the bar, and searched his pants for another wad of money and took that. Now, I've yet to meet a robber that would have that kind of an MO. No, I'm saying, my question was, couldn't he have taken, couldn't a robber have taken the $400 in hundreds and fifties that's visible in his pocket, in the shirt pocket, that the bouncer saw, that would be normal, takes what he can see, and misses that the victim has another $400 in his pants that's a thick wad. The officer didn't say the thick wad was in his shirt pocket, right? That's correct. But the officer went through his pants pockets and went through the clothing that he had when he got to the scene. There was no other money. There was only the eight $1 bills in his front pants pocket, and $2.02 in change and a $1 bill laying on the street. And I'm not doing this maliciously, but I'm just pointing out that this is somewhat confusing, because even the respondent says the petitioner took the money from the shirt pocket, but left the thick wad on his body. I guess where all this leads me is the jury obviously had to decide whether or not the victim was in possession of some amount of money that was missing after the robbery. And the problem is that nobody can say conclusively one way or the other, but we do know that he had a large amount of money on him earlier in the evening. We just don't know what happened to all of it. And this would not be the first robbery in the history of robberies where the robber either was interrupted in the course of the robbery after he had shot. He now has a witness who's running away that he shot. Maybe he decided he better get out of there before people started coming. Wasn't there some testimony about a black man on a bicycle who was in the vicinity at the same time? That's correct. So, I mean, for all we know, he never successfully completed his search of the victim. But our whole point here, certainly with respect to the ineffective assistance, is that trial counsel could have put their hands on the record at trial, could have brought out to the jury that the robbery, in fact, if it took place, involved a situation where 400 and some odd dollars was left on the victim and was transferred to the hospital. And it's not by happenstance. That happens to be the last amount of money seen by anybody when he left the bar. Thank you. All right. Just a couple of comments. Flip note 21 on page 32, Your Honor, is where I did comment on the procedural bar not being applicable. And I did want to mention that we believe the misconduct claims, including the differences in standard and Chapman, was certainly before the California Supreme Court. And it was discussed, in fact, at great length in the supplemental petition, but most importantly in the informal response. And the reason it's important is that the informal response is said to be for purposes of the California Supreme Court, helping them to determine whether or not there's a crime-official case made out. And the government argued in response to that that there had not been a showing of materiality. And the response from the petitioners was a lengthy discussion of the Thomas testimony, of the misconduct contention. So the California Supreme Court had that before them in terms of the claim of misconduct. And it also was alleged in the first amendment petition specifically as well. As a closing remark, I would just like to say, again, the emphasis, all this about what the jury could have concluded or didn't conclude, the problem here is why were they not allowed to see the evidence of the money that was found in the victim? I mean, it's not allowed. I mean, we know that there were exhibits introduced at trial that either they didn't look at them or they'd forgotten or whatever it is, but we know that there was reference to that money in exhibits. Two little slips of paper, one in a medical file that was in an envelope that was the medical file of Tredo, which really had nothing to do with any issue in the case. He was dead. The other was in an autopsy report that the coroner's office brought in. It was another little slip of paper. And the prosecutor saw those slips of paper. I don't know that the defense, they say they did not in their declarations before the California Supreme Court. But the point was that are we to expect in a death penalty case the jury's going to go through all those papers and find these little slips of paper and say, oh, here's this money, when the prosecutor did not mention it at all and instead put on an officer, Officer Thomas, to clearly leave the impression that when he left the bar he had money in his shirt pocket and a few minutes later when he's laying there dying, he didn't. Well, for purposes of the Brecht analysis, don't we have to assume that the jury took its obligations very seriously in the penalty phase and that it carefully reviewed the evidence? Well, the evidence before it that they... It's the same jury that had convicted him, was it not? Well, it is. But I guess I'm not talking about the penalty phase. I'm referring to... Yeah, but I think you're suggesting that somehow the jury didn't look at the exhibits that were sent and that certainly has not been the case. Well, I think what I'm talking about, Your Honor, is the prosecutor purposefully putting on evidence that left a misimpression, an impression before the jury that simply was not true, relying essentially on the ignorance of the defense attorneys not to bring it out. I mean, the Thomas testimony could have been totally impeached, whether he was lying or not lying with the fact that there was money found on the body when they were left the impression it wasn't. And I don't know that the system should be one, and I don't think under Augers and Mooney and all those cases, that the prosecutor is free to put on what she knows to be a false impression of the jury, relying on the fact that the defense attorneys... ...didn't look at the penalty phase positions. Is this the argument about not putting on the evidence about money taken to the hospital? It seems to me it's a liability, not a guilt phase argument. I might be wrong about that. Well, we think it's guilt phase because it does impact on the entire question of what happened in the parking lot. So Burroughs said it was a robbery. The whole thing that happened, he was the only one who said the petitioner came up, pointed a gun and said, give me your money, and then shot Trayto and shot him as he was running away. If there was a question as to whether there's a robbery, there's a question as to his credibility, not only as to what happened in the parking lot, but who committed the crime. So I think that's our argument as to why it does impact on the guilt phase. Okay. As to why it has an impact on the guilt phase, and that is what happened in the parking lot. It raises questions for the jury to consider what really happened. Was it a robbery or was it not a robbery? And if it wasn't, what's Sir Burroughs' credibility, keeping in mind he's the only person who claims to know what happened and he's the only person who identified the petitioner as being the one who was back there committing the murder although obviously there was no question that he was in the vicinity. Thank you, Your Honors. Thank you. All right. The case is submitted. And thank you for your arguments. They were both very enlightening. And we'll recess until 930 tomorrow morning, Friday. Thank you all. Thank you.
judges: Pregerson, Gould, Tallman